IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JEFFERY T. OLSUFKA,<br><br>               Plaintiff,<br><br>vs.<br><br>CITY OF WAYNE, NEBRASKA,<br>MARLEN CHINN, in his individual<br>capacity, and BRIAN SWANSON, in<br>his individual capacity,<br><br>               Defendants. | 4:20-CV-3154<br><br>MEMORANDUM AND ORDER |

The plaintiff, Jeffery T. Olsufka, brings this action pursuant to 42 U.S.C. § 1983, alleging claims regarding his unlawful seizure, the use of unnecessary or excessive force to effect his seizure, and a forced medical evaluation, which included an unlawful search of his person. Filing 21. The plaintiff alleged that the several violations of his Fourth Amendment constitutional rights occurred due to an official city policy or custom, as well as the city's failure to supervise and train its police officers. Defendant Marlen Chinn is the Chief of Police for the City of Wayne. Defendant Brian Swanson is a City of Wayne police officer, holding the rank of sergeant. Filing 21 at 2. The defendants move for summary judgment pursuant to Fed. R. Civ. P. 56(a) on the merits of the plaintiff's constitutional claims, and on the basis of qualified immunity for the individual defendants. Filing 25. For the reasons that follow, the Court will deny the defendants' motion.

# I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id. Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042

Typically, in resolving a defendant's summary judgment motion, a court must accept the plaintiff's version of the disputed facts, as well as the reasonable inferences from those facts. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *McManemy v. Tierney*, 970 F.3d 1034, 1038 (8th Cir. 2020). However, where a video record blatantly contradicts the plaintiff's account of the event such that no reasonable jury could believe it, the plaintiff's version of the disputed facts may be disregarded in evaluating whether the defendant is entitled to summary judgment. *Id.*

The plaintiff, in resisting a motion for summary judgment pursuant to § 1983, must raise a genuine issue of material fact whether (1) the defendant acted under color of law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right. *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th Cir. 2006).

2

## II. BACKGROUND

On the evening of August 18, 2019, Joshua Masur saw something that caused him to call 911. Masur reported that next door, there is "a guy just rolling around in the grass and screaming." Filing 14-15 at 0:31-0:35. The police dispatcher answering the call asked Masur if he knew "what's wrong with him or what's it seem like." Filing 14-15 at 0:39-0:42. With some hesitance, Masur replied, "It … it's almost like … drugs." Filing 14-15 at 0:42-0:44. After obtaining some identifying information from Masur, the dispatcher put out a call: "In route to the next alert to 520 Logan. We have a male rolling on the ground screaming, possible drugs." Filing 14-15 at 1:18-1:28.

First to respond was Wayne police officer Drew Marshall,[1] arriving at approximately 7:35 p.m. Filing 27 at 4. Marshall approached the plaintiff and identified himself as a police officer. Dogs can be heard barking in the background and the plaintiff is heard making a sound of some kind that the defendants characterize as loudly mumbling or moaning. Filing 14-9 at 4:00; filing 27 at 4. Marshall found the plaintiff lying on the ground next to a wire fence. Filing 14-8 at 1. He asked the plaintiff if he was okay, and the plaintiff replied, "Oh yeah." Filing 14-9 at 4:24-4:26. Marshall then asked the plaintiff for his name, but the plaintiff didn't respond. Filing 14-9 at 4:26-4:30. Marshall told the plaintiff to just stay on the ground, and don't get up. Filing 14-9 at 4:30-4:32. The plaintiff replied, "No problem." At this point, the plaintiff

---

[1] The cruisers of both officers who responded to the call had video recording capabilities, and the officers were equipped with body-worn microphones. Officer Marshall was first on the scene, but parked his cruiser away from the area of the encounter. As such, Marshall's recording of the occurrence is audio only. Filing 14-9. Sergeant Swanson was second on the scene, and his cruiser was parked such that his encounter with the plaintiff was both video and audio-recorded. Filing 14-2.

3

sounded very groggy, and his speech was slurred. Marshall asked, "Are you under the influence of something?" The plaintiff quickly responded, "No," but Marshall continued his inquiry, saying, "I feel like you're under the influence." Filing 14-9 at 4:35-4:41. The plaintiff then said, "I really don't know where— how I got here, but I just had the most f**kin' crazy …" Filing 14-9 at 4:40-4:46.

Marshall continued asking the plaintiff for his name, whether he's under the influence, and what he's taken today. Filing 14-9 at 4:46-4:56. When Swanson arrived, he asked Marshall "What's he got?" Marshall asked Swanson if he should call for the rescue squad, saying "He's out of it." Before Swanson could answer, Marshall said, "I'll do it," and appears to tell dispatch to call for rescue. Filing 14-9 at 4:50-5:09; filing 14-2 at 0:40-0:59. Reacting to Marshall's request for the rescue squad, the plaintiff says, "No, no, no," and tells the officers that he's fine, Filing 14-9 at 5:01-5:03.

Swanson asked whether there was anyone else home, and the plaintiff responded, "Yeah, my girlfriend's home." Filing 14-9 at 5:11-5:16; filing 14-2 at 1:01-1:06. The plaintiff tried to stand up, but Marshall ordered him to stay down. When the plaintiff continued to move to a sitting position, Marshall said, "Are you going to be cooperative?" The plaintiff replied, "Yes, absolutely." Marshall then told the plaintiff that "he can stand up here." Filing 14-2 at 1:09-1:14; filing 14-9 at 5:17-5:25. Marshall asked the plaintiff, who was now in a seated position, for his first name, and the plaintiff said "Jeff." Marshall then asked the plaintiff for his last name. The plaintiff answered "Olsufka," and corrected Marshall when he mispronounced it. Filing 14-9 at 5:32-5:41; filing 14-2 at 1:20-1:31. Marshall asked if he can help him get up, but the plaintiff said "No, I can get up myself I think." Filing 14-9 at 5:41-5:44; filing 14-2 at

4

1:32-1:34. At this point, the plaintiff sounds much more coherent than he did when Marshall first encountered him.

Swanson asked, "Jeff, what's goin' on man?" Filing 14-2 at 1:36-1:38. The plaintiff replied, "Nothing, I was actually just … I don't know I'd have to look up there and see what I was doin' but…" Interrupting, Marshall tells the plaintiff that he knows that this is where he lives. Marshall then recalls for the plaintiff the time he bought lemonade from the plaintiff's child, and how he had a nice conversation with the plaintiff, "but you weren't acting like this so what's goin' on today?" Filing 14-9 at 5:48-6:03. The plaintiff answered, "I'm fine, I have no problem. I fell over." Interrupting again, Marshall asks, "Did you hit your head? You look like you have a scrape on your head." Continuing with his explanation, the plaintiff said, "No, I was probably going too fast. I haven't been drinking enough water, it's a big problem with me." Filing 14-9 at 6:03-6:14. Marshall said, "Well, we need to probably get you some help, man." The plaintiff answered, "No, no, no, no, I'm fine, I'm fine, I'm fine, I'm fine. This has happened before, this happened before." Filing 14-9 at 6:28-6:35.

Meanwhile, Swanson had walked over to an enclosed porch at the back of the plaintiff's house and knocked on the door, but no one answered. Filing 14-2 at 1:50-2:19. The plaintiff is now able to able to stand without assistance. Filing 14-2 at 2:36-2:46. When Swanson returned, he tells the plaintiff that he looks pale. Filing 14-2 at 2:48-2:49; filing 14-9 at 6:58-6:59. Swanson asked if it was okay for him to go inside the attached porch and knock on the door. The plaintiff gave Swanson his permission, but no one responded after Swanson knocked several times on the door inside the porch. Filing 14-2 at 2:50-3:45.

While Swanson was inside the porch, Marshall asked the plaintiff "What … when this happened before, was it a medical problem?" Filing 14-9 at 7:07-7:12. The plaintiff explained that this same thing happened a couple months

ago, and his girlfriend just said today that he should be on medication for it. Filing 14-9 at 7:10-7:21. Marshall asked if the plaintiff knew what today's date was. Filing 14-9 at 7:32. The plaintiff said, if he thought about it, he probably would, and explained that he had been out of work for a couple months, implying he had lost track of the date because he wasn't working, not because of some other reason. After thinking for a while, the plaintiff correctly identified the date as August 18. Filing 14-9 at 7:33-8:00.

Upon exiting the enclosed porch, Swanson told the plaintiff that his girlfriend isn't answering the door. The plaintiff then said, "Oh, she might be gone." Swanson asked what his girlfriend is driving, and the plaintiff said a Subaru Outback. Filing 14-2 at 3:51-3:57; filing 14-9 at 8:01-8:07. The plaintiff, again, tells the officers that he is fine. "Hey guys, everything is fine. I'm fine. This happened before." Filing 14-9 at 8:07-8:11. Swanson response was, "Well that's not normal behavior." Filing 14-2 at 3:58-4:00. The plaintiff continues; "No, no, no, no, I'm fine. I am totally fine. I have done this before. She can vouch for me. It happened—it happened in my house, right at my stairway. I'm walking, everything's fine, I think I can get up some steps. Honestly, sometimes I get…" Filing 14-9 at 8:11-8:22.

Interrupting the plaintiff's explanation, Swanson asks if the plaintiff has a phone and where his phone might be. Filing 14-2 at 4:14-4:22. The plaintiff explained that he didn't know where his phone was, and that he doesn't use it that often because he's been unemployed for a while and "off the grid." Filing 14-9 at 8:27-8:42. Swanson then asked the plaintiff for his girlfriend's name. The plaintiff sighed, and now seemed irritated with the questioning, telling them, "You guys, there's really no need for this." Filing 14-2 at 4:32-4:45; filing 14-9 at 8:43-8:49.

6

Marshall responds, "Well. Hold on. Jeff, you need to bear with us so that we can get out of here if everything is okay." Filing 14-9 at 8:50-8:56. The plaintiff continued to protest, saying, "You don't need a statement, there's nothing going on out here." Marshall then wanted the plaintiff to spell his last name, and Swanson says, "To me it looks like you're under the influence of something." Marshall adds, "Yeah, really bad." Filing 14-2 at 4:46-4:54; filing 14-9 at 8:56-9:04. The plaintiff, again, denies the accusations, telling the officers,

> No, I'm not, I'm not. I just collapsed and it took me a long time to get everything—I don't know, I would call it, processing again. I don't know if you've ever had something like that happen where you get up too fast after standing, or sitting for a long time, or laying down, get up too fast, blood stays wherever, and you start to pass out. I had come this way for some reason, I don't know, I can't remember what I was doing back here actually.

Filing 14-9 at 9:05-9:32.

Marshall now tells the plaintiff to write his last name because he's not going to spell it correctly. The plaintiff declines, saying, "You know what, I don't need to do this." Filing 14-9 at 9:32-9:36. Now the encounter appears to turn confrontational. Marshall says, "Well Jeff, you gotta identify yourself." Swanson adds, "Or you're gonna go to jail for, ah, disturbing the peace." Filing 14-2 at 5:26-5:32. Calmly, the plaintiff responds, "That's outrageous you guys, come on." Filing 14-9 at 9:36-9:45. Swanson says, "We got called here because of your behavior." The plaintiff then starts to mock Swanson's claim saying, "Oh yeah? What was that? He's doing something crazy like, lying around like a madman, looks like he's on a hustle and bustle." Filing 14-9 at 9:45-9:53.

7

Marshall tries to change the subject, and again asks the plaintiff about the spelling of his last name, "Is that a U or an A? Olsufka?" Filing 14-9 at 9:53-9:55. With another sigh, the plaintiff answers, "U." Marshall then asked the plaintiff his date of birth, which the plaintiff provided. Filing 14-9 at 9:56-10:04. As Marshall calls the plaintiff's information into dispatch, Swanson tells the plaintiff; "We're here to try to figure out if you're alright. So, what's the medical issue then if you've done this before?" 14-2 at 5:53-6:03. The plaintiff explained that he has very high blood pressure, but the rest of the plaintiff's explanation is obscured by dispatch's communication with Marshall. Filing 14-2 at 6:02-6:26.

The plaintiff, yet again, tells the officers, "I'm doing good, everything's fine." He then starts chatting with the officers about how he has been off work, the problems he was having with his last job, and how he doesn't want to go back to his old job because it wasn't safe. As this conversation progressed, the plaintiff started telling the officers about his interest in geology. Filing 14-9 at 10:36-12:00. Marshall interrupted the plaintiff to ask him if there was anything under his shirt, and then realized that the plaintiff was wearing a back brace. Filing 14-9 at 11:58-12:10. Swanson tells the plaintiff he would like to talk to his girlfriend to see if she can confirm what he is telling them. Filing 14-2 at 8:00-8:07. Marshall says he'll just run her plates to get her name, and turns to walk away. Filing 14-2 at 8:03-8:05; Filing 14-9 at 12:13-12:15.

Now, the plaintiff's protests get louder, saying, "I'm fine, I told you …" When Swanson says, "Jeff, just hear me out," the plaintiff, instead, says "I'm done with you guys I'm going inside" and appears to move slightly toward the front of his house. Filing 14-2 at 8:06-8:14; filing 14-9 at 12:16-12:24. Marshall stops moving away, and gets between the plaintiff and the front of his house, which stops the plaintiff from going any further. Filing 14-2 at 8:16. Marshall

8

tells the plaintiff, "No. No. You've hit your head, you're not going to leave right now. Filing 14-9 at 12:23-12:26. The plaintiff begins to raise his voice again and say, "You can't detain me for falling down." Filing 14-2 at 8:15-8:19; filing 14-9 at 12:25-12:29. Marshall tells him, "You're detained at this time. You've hit your head." Filing 14-9 at 12:26-12:30. The plaintiff responds, "Absolutely not, and I will scream like a three-year-old if your guys try to detain me …." Filing 14-9 at 12:29-12:37. Now, seeing that Marshall has taken out his taser and is pointing it at him, the plaintiff shouts "or tase me," and with a loud, derisive laugh, starts walking away shouting "Oh my God, you guys." Filing 14-2 at 8:27-8:37; filing 14-9 at 12:37-12:44.

Marshall is heard to tell dispatch, "He's uncooperative. Stand by." Filing 14-9 at 12:43-12:44. As the plaintiff continues to shout, Marshall tells him that he's not being cooperative. Filing 14-2 at 8:39-8:41; filing 14-9 at 12:49-12:51. The plaintiff responds that he is being cooperative, but he wants to go into his own home, and he's on his own property. Filing 14-2 at 8:41-8:50; filing 14-9 at 12:51-13:00. When the plaintiff keeps talking, and insulting the officers' intelligence, Swanson tells him "You're gonna talk yourself into going to jail is what's going to happen." Filing 14-2 at 8:52-8:56; filing 14-9 at 13:02-13:06. The plaintiff's response is, "I don't care man. It always goes that way." Filing 14-9 at 13:04-13:07. "Hey look. You guys. I've been screwing around with you guys for so long. All I want to do is . . ." Filing 14-2 at 8:57-9:10.

The rest of the plaintiff's response is cutoff when dispatch breaks in to tell the officers that the plaintiff is on "active probation," but doesn't provide any details regarding the reason for the plaintiff's probationary status. Filing 14-9 at 13:10-13:18. One of the officers immediately tells the plaintiff, "You're on probation. Be cooperative." Filing 14-9 at 13:18-13:21. Swanson then threatens to contact the plaintiff's probation officer. Filing 14-2 at 9:10-9:14;

9

filing 14-9 at 13:20-13:24. The plaintiff responds, "Do it. Tell him. Big deal. He was just here a couple days ago." Filing 14-9 at 13:23-13:26.

Swanson tells the plaintiff that what he wants to do is talk to his girlfriend and confirm what he's telling them. Filing 14-2 at 9:19-9:22; filing 14-9 at 13:09-13:12. The plaintiff says he'll go see if he can find her, and moves slightly toward the front of his house. Swanson tells the plaintiff, "No, you're gonna hang out here." Filing 14-2 at 9:21-9:26. As the plaintiff continues toward the front of the house, taking no more than five steps, he points out that his girlfriend's vehicle is "right there." Marshall shouts, "Stop, Stop," and Swanson grabs the plaintiff's left arm. Marshall shouts, "Stop or you're gonna get tased. Stop or you're gonna get tased." Filing 14-2 at 9:22-9:33; filing 14-9 at 13:32-13:43. Swanson then spins the plaintiff around and takes him to the ground. Filing 14-2 at 9:34-9:36. As he's taken down, and while on the ground, the plaintiff repeatedly shouts, "I'm done, I'm done." Filing 14-9 at 13:44-13:50. Swanson tells the plaintiff to roll over onto his stomach, which he does, and both officers then kneel on the plaintiff's back, neck, and head while Swanson puts the plaintiff into handcuffs. Filing 14-2 at 9:36-10:23.

The plaintiff's voice is now muffled as he shouts, "Why do you gotta kneel on my face like that. God damn it, I hope someone's watching this," and after some unintelligible grumbling sounds, he shouts, "Why is this happening. Oh God." Filing 14-9 at 14:10-14:25. Swanson can be heard to say, "He's gonna go for disturbing the peace." Filing 14-9 at 14:25-14:29; filing 14-2 at 10:15-10:19. Once secured, Swanson stands and leans over the plaintiff, telling him, "What'd I tell ya? Hey, Jeff, what'd I tell ya? What'd I tell ya?" Filing 14-2 at 10:38-10:48; filing 14-9 at 14:51-15:01. Marshall continued to kneel on the plaintiff's head and neck area after he was in handcuffs and not resisting. Filing 14-2 at 10:18-10:40.

10

The rescue squad that Marshall had called was stopped approximately a block away from the scene because the plaintiff was, in the officers' view, uncooperative. Now that the plaintiff was restrained and on the ground, Marshall told dispatch to have the rescue squad proceed to the location. Filing 14-9 at 15:23-15:36. Swanson said to Marshall, "He needs to be checked out." Marshall responded, "Yeah, I agree." Filing 14-2 at 11:35-11:38; filing 14-9 at 15:44-15:48. The plaintiff continued cursing and complaining about the officers' actions, sarcastically asking, "You got the beating out for the day? Yeah, I'm sorry. Was I your first one, or your third one, or what? Jesus Christ almighty. Do you guys do that all f**kin' day? Do you just attack people all f**kin' day like animals? Jesus Christ, man, I'm a human being! What the f**k's wrong with you? What the f**k's wrong with you? Human beings don't do this to each other. Jesus f**kin' Christ." Filing 14-9 15:55-16:26; filing 14-2 at 11:45-12:16.

As the plaintiff continued to taunt and curse at the officers. Swanson asked, "Do you want to give me your girlfriend's name?" The plaintiff replied, "No. I want someone to get me out of here, I want to keep my mouth shut." Filing 14-2 at 12:26-12:36; filing 14-9 at 16:36-16:46. The plaintiff then attempts to sit up, and Marshall stops him, which prompts the plaintiff to loudly shout about not being allowed to sit, and how the officers are out of control. Once seated, the plaintiff begins shouting "Britt," and tells Swanson to go knock on the "god damn glass, she can hear." Marshall tells the plaintiff, "No, we're not doing that." Filing 14-9 at 16:46-17:22; filing 14-2 at 12:36-13:12. The plaintiff then narrated what, in his view, had occurred: "If you think you're gonna tase me. I hope someone's watching this. I had a small seizure, on my property. The police came, I woke up they tackled my ass on my own property,

for no f**king reason at all, kneed my face into the ground, handcuffed me."
Filing 14-9 at 17:23-17:50; filing 14-2 at 13:13-13:40.

As the plaintiff continued to shout for his girlfriend, Swanson asked,
"Are there any drugs or anything in the house? The plaintiff answered, "F**k
no, man." Swanson then asked, "Does your wife, your girlfriend do drugs?" The
plaintiff answered, "No. We don't do f**kin' drugs." Filing 14-9 at 17:57-18:14;
filing 14-2 at 13:47-14:04. The plaintiff then attempted to stand up, and the
officers prevented him from doing so. The rescue squad has now arrived.
Swanson tells the plaintiff he's going to have them check him out, and if he
lays a hand on them, he will be charged with assault. Filing 14-2 at 14:19-
14:27; filing 14-9 at 18:29-18:37. The plaintiff, however, is unable to assault
anyone as he is still handcuffed and being forced to sit on the ground. The
plaintiff continued to curse at the officers, and specifically responding to
Swanson's threat of charging him with an assault, the plaintiff said, "Man, you
shut the f**k up you god damn pig," and shouts, again, that the officers are out
of control. Filing 14-9 at 18:33-18:42.

As the rescue personnel approach the plaintiff, he shouts "I didn't do
anything wrong at all." Filing 14-2 at 14:30-14:37. One responder asks, "What
do we have here, what's your name sir?" The plaintiff calmly replies, "What's
up man, I'm fine, what do you need from me?" Filing 14-2 at 14:35-14:40.
Swanson tells the responders that they "got called here, he was laying in the
yard, rolling around, yelling, screaming." Filing 14-2 at 14:48-14:56. The
plaintiff interrupts Swanson, telling the responders, "Yeah, I had a f**kin'
mini-seizure, happened two days ago too, my girlfriend saw it, it was fine, I
was fine afterwards." Marshall interrupts to say, "He's been belligerent the
entire time." Continuing, the plaintiff says, "Everything turns white, it takes
me awhile to gain myself back, I'm sorry." Filing 14-2 at 14:54-15:07. A

12

responder asked the plaintiff if he was diabetic or had epilepsy, to which the plaintiff responded "No." However, when asked if he had a history of seizures, the plaintiff said he's had seizures "several times throughout my twenties and into my early thirties, but it's not a big deal. This is the first time it's happened outside" Filing 14-2 at 15:07-15:20; filing 14-9 at 19:17-19:30.

One of the responders tells the plaintiff that they are going to take him to the hospital and "get you checked out." The plaintiff said, "No, no, no, no I refuse." When the responder tells the plaintiff that he can't refuse at this time, the plaintiff calmly replied "I can refuse, I can … refuse any sort of treatment. And I did absolutely nothing wrong on my own property." Filing 14-2 at 15:28-15:48; filing 14-9 at 19:38-19:58. While still handcuffed, the plaintiff is allowed to stand up, which he does without assistance. Filing 14-2 at 16:10. The plaintiff continues to berate and curse at the officers. A responder asks the plaintiff, "Have you had any alcohol or drugs today?" The plaintiff responds, "No man." Filing 14-2 at 16:28-16:30.

Swanson then walks to the front of the house, and speaks with Joshua Masur, the individual who had called 911 about the plaintiff. Masur repeated for Swanson what he had told the 911 dispatcher. Filing 14-2 at 16:29-17:00. Swanson said, "I don't know if we got a … something medical or if we have something drugs or what's going on." Filing 14-2 at 17:00-17:07. Swanson can be heard to loudly knock on the plaintiff's front door, and his knock is promptly answered by the plaintiff's girlfriend, Brittany DuMars. Filing 14-2 at17:32-17:45. Swanson asks DuMars to step outside, and then says, "Tell me about your boyfriend, what drugs are you guys taking?" Obviously surprised, DuMars replies, "Ah, nothing." Swanson then asked if the plaintiff has any medical issues—taken any drugs" to which DuMars responded "No, what's wrong?" Filing 14-2 at 17:46-18:04. Swanson tells DuMars that the plaintiff is in

13

handcuffs, and then asked if the plaintiff passes out or has seizures. Filing 14-2 at 18:09-18:18.

The plaintiff tries to walk to the front of the house where Swanson is talking with DuMars, but is taken down again by Marshall, because, according to Marshall, he "did not tell him to move." Filing 14-2 at 18:02-18:07; filing 14-9 at 22:15-22:25. The plaintiff starts screaming "Crazy f**cking cops" over and over. Filing 14-2 at 18:16-18:25. DuMars, hearing the plaintiff's shouts, walks quickly to the side of the house where Marshall has the plaintiff pinned to the ground. DuMars tries to calm the plaintiff down and get him to stop swearing and shouting. Filing 14-2 at 18:26-20:11; filing 14-9 at 22:33-22:50.

DuMars asks the plaintiff, "What are you doing?" The plaintiff tells her that he had passed out and when he woke up, these guys were here, and they tackled him. Filing 14-2 at 18:41-19:00. DuMars confirmed for Swanson and one of the responders that the plaintiff has lost consciousness before when he stood up too fast. She also confirmed that the plaintiff has not used any drugs because he was on probation. Filing 14-2 at 18:48-19:22. Swanson asked DuMars if she wanted to take the plaintiff to the hospital, and she replied no. She didn't think the plaintiff would want to go because he doesn't have insurance. Filing 14-2 at 19:47-20:00. The plaintiff continued telling everyone that he's fine, that he doesn't want to go to the hospital, and he's angry because he's been handcuffed and is being treated like an animal when all he did was fall down. Filing 14-2 at 19:48-20:12.

Swanson and the two responders step away from where Marshall continued to restrain the plaintiff on the ground. Swanson asks them if we place the plaintiff under arrest and take him to the hospital, what will they be able to check out. He's essentially told they will check his blood pressure, and do a blood screen, a CBC (complete blood count), a toxicology screen and

14

urinalysis, but if the plaintiff doesn't cooperate and agree to provide biological samples, there's not a whole lot they can do, "unless you're going to hold him down." Filing 14-2 at 20:16-21:00.

Swanson walks away from the scene of the encounter to make a call to Police Chief Marlen Chinn. Filing 14-2 at 21:13; filing 27 at 8. Only Swanson's side of the conversation is recorded. Swanson very briefly described why they were called to the scene, and that the neighbor who had called 911 said the plaintiff's condition was probably drug-induced. Filing 14-2 at 22:21-22:29. Swanson tells Chinn that the plaintiff was in handcuffs because "he tried to get away from us," and that the ambulance is here, but the plaintiff is refusing to go and Swanson doesn't think the jail will take him. Swanson said, "I don't know if it's medical, or drugs, or what." Filing 14-2 at 22:30-22:44 Chinn apparently asked something, and Swanson answered, "his girlfriend is, she's saying no drugs, and said that he had passed out awhile back, got up too soon or something like that." Filing 14-2 at 22:46-23:01. Swanson then expressed his concern that the police department could be "gettin' stuck with a hell of a medical bill if we take him up there, plus we'll have to babysit him." Filing 14-2 at 23:03-23:11.

After an extended conversation with Chinn in which Swanson described taking the plaintiff down twice, that he was "belligerent as hell," and acknowledged that right now the plaintiff is "f**kin' pissed," Swanson tells Chinn that if we take him to the hospital and "he refuses to give a blood draw, you can't f**kin' force him, can ya? So I don't know what the hell it's gonna save by taking him." Chinn appears to suggest a strategy for getting the plaintiff to the hospital to be checked out that Swanson agrees to try—telling Chinn "I guess I could try that, but I don't think he's going to. I don't—like I said, I don't know if it's f**kin', ah, you know, something medical, diabetic, or

if he's f\*\*kin' just takin' shit. She's saying not—said no medical, no drugs." Filing 14-2 at 23:11-25:44.

Swanson, after ending the call with Chinn, tells dispatch to contact the plaintiff's probation officer and have him call Swanson on his cell phone. He then approaches the plaintiff and DuMars, and tells them that he can't force the plaintiff to go to the hospital and provide a urinalysis, "so if he's gonna refuse to do that, he's just gonna go to jail." Filing 14-2 at 26:03-26:22; filing 14-9 at 30:23-30:32. DuMars asked if they could just release him, and Swanson said "No, I'm not releasing him." Filing 14-2 at 26:22-26:24. One of the responders added, "He's gotta either go to the hospital or go to jail." Filing 14-2 at 26:25-26:29; filing 14-9 at 30:35-30:39.

Swanson then approaches the plaintiff, telling him, "This is what the deal's gonna be Jeff … this is what's gonna happen," if he wanted to go to the hospital "and not give them a damn bit of grief and let them do the blood work or urinalysis" and "make sure this isn't a medical issue, I will issue a citation for disturbing the peace and you can come back home. If you don't and you give them any bit of grief, . . . you're gonna go right to jail." The plaintiff replied, "deal, do it." Continuing, Swanson tells the plaintiff, "So from this point on, quit the bitchin', lay off of it, let them do what they need to do to make sure you're alright." Filing 14-2 at 26:43-27:20; filing 14-9 at 30:53-31:30.

The plaintiff was taken by ambulance, handcuffed to a stretcher, to the Providence Medical Center in Wayne. Filing 14-18 at 2. The EMS patient care report noted that at the scene, the plaintiff was "cursing and fighting officers" and had to be handcuffed. But after "much negotiation," the plaintiff walked to the ambulance and became "more coherent and cooperative." The report noted that the plaintiff said that he hadn't drank much in the way of fluids today. It

16

was also noted that the plaintiff was cooperative during the transport to the hospital.

Swanson followed the ambulance to the hospital, and while on the way, received a call from the plaintiff's probation officer. Swanson told the probation officer that they are dealing with his probationer, and asked whether he knew of "any drug use or anything with him?" Filing 14-2 at 33:30-34:05. After listening to the probation officer for a while, Swanson gave him a rough recap of the encounter, and said that he thinks they have the plaintiff talked into providing "some blood work or something. Obviously, we can't force that issue." Filing 14-2 at 34:06-35:47. The probation officer asked, "Was his girlfriend there?" Swanson said she came to the door

> quite a while later, 'cause that's what I was afraid of was that there was, ah, you know a bad batch of something, or they had both been taking something and she was laying in there, but she did end up comin' out, said that as far as she knows there's no drug use or anything like that.

Filing 14-2 at 36:00-36:27.

The hospital records indicate that the plaintiff arrived by ambulance at 8:17 p.m. Filing 14-5 at 91. He was described as alert and oriented, but "not happy about being in the ER and did not want a work-up," but still okayed getting basic lab work and an EKG done. Filing 14-5 at 53. The plaintiff was quickly diagnosed as suffering from acute dehydration. He was administered two liters of normal saline solution by IV, the first liter starting at 8:38 p.m. while still handcuffed and with police at his bedside. Filing 14-5 at 53, 91. At 9:45 p.m., his second liter of normal saline was started. The plaintiff was

17

discharged at 11:09 p.m., walking out of the emergency room without assistance. Filing 14-5 at 91.

## III. DISCUSSION

The parties' characterizations of the plaintiff's cognitive capacity during the course of his encounter with the officers—an event which was captured on Swanson's video recording and on Marshall's audio recording—significantly diverge. For example, the defendants characterized the plaintiff's answers to the officer's questions as "slow, slurred and many times non-responsive." Filing 27 at 4. The plaintiff, in contrast, asserts that he "clearly and coherently responded to Marshall's questions, explaining what happened to him, how he felt, who was home, and denying he was under the influence of drugs." Filing 32 at 3.

The Court is required to accept the plaintiff's version of disputed facts unless blatantly contradicted by a video record such that no reasonable jury could believe it. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *McManemy v. Tierney*, 970 F.3d 1034, 1038 (8th Cir. 2020). Here, the video and audio recordings of the encounter do not blatantly contradict the plaintiff's version of the facts. Accordingly, the Court will accept the plaintiff's characterization of his cognitive capacity during the course of his encounter with the officers for the purposes of this motion. A jury, however, is not bound by the same standard of review, and may not credit the plaintiff's version of the encounter over the defendants' version.

The individual defendants argue that the doctrine of qualified immunity compels dismissal of the plaintiff's amended complaint. Qualified immunity shields government officials from suit in a § 1983 action unless their conduct violates a clearly established right of which a reasonable official would have

18

known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs,* 475 U.S. 335, 341 (1986), and allows "ample room for mistaken judgments." *Id.* at 343.

Whether a governmental official is entitled to qualified immunity involves resolution of a two-part question: (1) whether, viewing the facts in the light most favorable to the plaintiff, there was a deprivation of a constitutional or statutory right; and if so, (2) whether that right was clearly established at the time of the deprivation such that a reasonable official would understand that his or her conduct was unlawful in the situation at hand. *Pearson v. Callahan,* 555 U.S. 223, 232 (2009). A court is permitted to exercise its sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. *Id.* at 236.

For a right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The official action protected by qualified immunity need not have been the very action previously held as unlawful, but the unlawfulness of the action must be apparent in light of the preexisting law. *Id.* The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

## 1. UNLAWFUL SEIZURE CLAIM

The "ultimate touchstone of the Fourth Amendment" is reasonableness. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). The area immediately surrounding and associated with a home—

19

the curtilage—is part of the home itself for Fourth Amendment purposes. *Florida v. Jardines*, 569 U.S. 1, 6 (2013). Because reasonableness is the ultimate touchstone of the Fourth Amendment, searches inside a home, as well as of its curtilage, are subject to certain exceptions to the requirement of a warrant. *Mincey v. Arizona*, 437 U.S. 385, 391-94 (1978). One such exception is when the exigencies of a situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment. *Id.*

As of August 18, 2019, the date of the occurrence in this matter, the Eighth Circuit Court of Appeals recognized a standalone exigent circumstances exception—the community caretaker exception—to the Fourth Amendment's warrant requirement.[2] Pursuant to the community caretaker exception, law enforcement officers may enter a residence without a warrant when they have a reasonable belief that an emergency exists requiring the officer's attention. *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006); *see also Graham*, 5 F.4th at 882. The exception may be justified in certain limited situations, such as helping someone who is in danger. *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016).

Community caretaking describes the function of law enforcement officers acting in a non-investigatory capacity, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute. *United States. v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014). Law enforcement officers are not only permitted, but expected to exercise community caretaking functions. *Samuelson v. City of New Ulm*, 455 F.3d 871,

---

[2] Subsequently, the Supreme Court clarified that the community caretaker exception is not a standalone doctrine that justifies warrantless searches in a home. *Caniglia v. Strom*, 141 S. Ct. 1596, 1598 (2021); *Graham v. Barnette*, 5 F.4th 872, 881 (8th Cir. 2021).

877 (8th Cir. 2006). A search or seizure of a person by a law enforcement officer acting in a non-investigatory capacity is reasonable if the governmental interest in the officer exercising a community caretaking function, based on specific articulable facts, outweighs the individual's interest in being free from arbitrary governmental interference. *Id.*; *Harris,* 747 F.3d at 1017. Further, the scope of the encounter must be carefully tailored to satisfy the purpose of the initial detention, and the individual detained must be allowed to proceed once the law enforcement officer's inquiry has been completed, unless a further reason to justify the stop arises. *Harris,* 747 F.3d at 1017.

The defendants argue that the encounter with the plaintiff was a welfare check, and was reasonable pursuant to their community caretaking function. Filing 27 at 1-15. The parties do not appear to dispute that the defendants' initial response to the 911 call—reporting that a man was rolling around in the grass screaming—was reasonable, and appear to not dispute that the defendants did what reasonable law enforcement officers would be expected to do in their initial response to the call. Where the parties disagree, however, concerns whether the scope of the full encounter was carefully tailored to satisfy the purpose of the initial contact. The Court finds that when the evidence is viewed in the plaintiff's favor, a jury could find that defendants Swanson and Chinn did not carefully tailor the scope of the encounter to satisfy the purpose of the initial detention, and did not allow the plaintiff to proceed once a reasonable inquiry related to the purpose for the initial contact had been completed.

The video and audio recordings in evidence show that when Marshall first contacted the plaintiff, he was lying on the ground against a fence, making nonverbal noises. Filing 14-9 at 4:00. Initially, the plaintiff seemed groggy, and his speech was somewhat slow and slurred. However, when defendant

Swanson arrived approximately a minute after Marshall, the plaintiff's condition had noticeably improved. Filing 14-9 at 4:40; filing 14-2 at 0:30. At this point, the plaintiff had told Marshall that he was okay, denied that he was under the influence of something, and when Marshall told Swanson that he was calling in the rescue squad, the plaintiff clearly told the officers not to call the rescue squad and that he was fine. Filing 14-9 at 4:24-5:03.

Over the course of the next three to four minutes, the plaintiff told the officers that he was fine at least three more times, denied again that he was under the influence of something, repeated that he did not want or need the rescue squad, identified himself for the officers, corrected Marshall when he mispronounced his name, responded correctly to Marshall's questions about what day it was, told the officers that his girlfriend was home, gave Swanson permission to go inside the back porch of his house to knock on the door, and was able to sit and stand without assistance. Importantly, the plaintiff told the officers that he had probably passed out because he has not "been drinking enough water, it's a big problem for me," and that he had passed out before but now he was fine. Filing 14-9 at 6:03-7:21. The video and audio of the encounter at this juncture shows that the plaintiff's speech was no longer slow or slurred, and his mental functioning appeared relatively normal.

The tone of the encounter began to change when Swanson returned from the plaintiff's back porch and told him that his girlfriend wasn't answering the door. Swanson started asking questions that had no discernable relevance to an emergency requiring his attention. He asked the plaintiff about the kind of car his girlfriend drove, whether he had a cellphone and where it might be, and asked the plaintiff for his girlfriend's name. In asking these questions, Swanson appeared to ignore the fact that the plaintiff kept telling the officers that he was fine, and that he had passed out before. When Swanson asked for

22

the plaintiff's girlfriend's name, the plaintiff sighed and appeared to become irritated with the officers ignoring his representations that he was fine. The plaintiff told Swanson that "there's really no need for this." Filing 14-9 at 8:43-8:49.

The plaintiff plainly had his fill of the encounter when Marshall told him to write his last name, which prompted the plaintiff to respond, "You know what, I don't need this." Filing 14-9 at 9:32-9:36. Swanson then tells the plaintiff that if he doesn't identify himself, he will go to jail for disturbing the peace. Filing 14-2 at 5:26-5:32. With this comment, the evidence, when viewed in the plaintiff's favor, suggests that Swanson's purpose for being on the plaintiff's property was no longer to respond to an emergency. Further, at this point, Swanson's purpose no longer appears to be totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute. *See Harris,* 747 F.3d at 1017. As the confrontation continued to escalate, the plaintiff repeatedly insisted that he was fine, and that he has passed out before. Swanson, however, questioned the plaintiff about whether the cause of the condition the officers observed when first called to the plaintiff's property was related to a medical issue, or related to drug use.

When the plaintiff finally told Swanson that he was done and going inside his house, Swanson and Marshall prevent him from leaving his yard, and told him he was detained because he had hit his head. Filing 14-9 at 12:16-12:30. The plaintiff protested, saying, "You can't detain me for falling down." Filing 14-2 at 8:15-8:19. When the plaintiff's protests became, louder, and more derisive,  abusive, and profane, Swanson told him that he's going to talk himself into going to jail. Soon, dispatch informed Swanson that the plaintiff was on active probation, and Swanson immediately threatened to call the plaintiff's probation officer. Finally, when Swanson told the plaintiff that he

23

only wanted to confirm what the plaintiff had told them with the plaintiff's girlfriend, the plaintiff started to walk toward the front of his house, telling Swanson that he will go find her. Swanson, however, shouted for the plaintiff to stop, and then grabbed the plaintiff's arm, swung him around, threw him to the ground, knelt on the plaintiff's back (knowing that he was wearing a back brace) and handcuffed him, all with the plaintiff offering little to no resistance. Filing 14-2 at 9:12-10:23.

The community caretaker exception applies when there is an objectively reasonable belief that an emergency exists requiring the officer's attention. *Quezada*, 448 F.3d at 1007. The clearly established law at the time of this encounter, at a minimum, required the defendants to have an arguable reasonable suspicion that the facts and circumstances within their knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a man of reasonable caution to believe that the plaintiff posed an emergent danger to himself or others. *Graham*, 5 F.4th at 886.

The defendants argue that at all times during the encounter with the plaintiff they were properly engaged in their community caretaking function. However, outside of the first minute of Marshall's encounter with the plaintiff, when considering the evidence in the plaintiff's favor, the Court is unable to discern what the emergent danger was that required Swanson's or Chinn's attention. The defendants argue that it was reasonable for the officers to detain the plaintiff to be treated by the rescue squad, filing 27 at 13), but do not identify the emergency treatment that was needed, or the emergency treatment that the rescue squad actually provided upon arrival. The defendants also argue that it was reasonable for them to be concerned about the plaintiff's physical or mental health. Filing 27 at 13. But assuming that to

24

be true, the defendants' concern, without specific articulable facts of an existing emergency, isn't enough.

In *Graham*, the Court of Appeals held that at the very least, the facts known to the officers at the time were sufficient to support arguable reasonable suspicion that Graham was experiencing a mental health crisis and presented an emergent danger to herself or others. 5 F.4th at 888. There, the officers believed Graham had threatened a family member, another family member warned officers that Graham may fight the officers, Graham had repeatedly called 911 over a two-hour period, the operator had reported that Graham's calls were nonsensical, and when the police arrived, Graham denied making calls and appeared confused. *Id.*

Here, in contrast, the evidence doesn't indicate that the plaintiff had made any threats to anyone, he did not fight with Swanson, or even resist when he was thrown to the ground and handcuffed. Before the physical confrontation, the plaintiff spent several minutes with Swanson explaining that he was fine, that he has passed out before, and even discussed his employment situation and his interest in geology. The defendants' characterizations that the plaintiff sounded groggy, or that he was incoherent, are not borne out by the video and audio recordings when that evidence is considered in a light most favorable to the plaintiff.

Further, the defendants argue that because the plaintiff's girlfriend did not respond to Swanson knocking on the back door, it was reasonable to keep the plaintiff from going into his own home due to concerns about her well-being. Filing 27 at 13. There may be a possible threat to an officer's safety or the safety of another in a number of situations. However, something more than a mere speculative hunch is necessary for the defendants to justify the plaintiff's seizure on his own property for the reason that his girlfriend didn't

respond to a knock on the back door. *See Luer v. Clinton*, 987 F.3d 1160, 1169 (8th Cir. 2021); *United States v. Anderson*, 688 F.3d 339, 346 (8th Cir. 2012). It is important to note that even after Swanson confirmed the plaintiff's representations about his condition with DuMars, Swanson did not end the plaintiff's detention and allow him to proceed.

A search or seizure of a person by a law enforcement officer acting in a non-investigatory capacity is reasonable if the governmental interest in the officer exercising a community caretaking function, based on specific articulable facts, outweighs the individual's interest in being free from arbitrary governmental interference. *Harris,* 747 F.3d at 1017. The Fourth Amendment's "very core" stands for the "right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Jardines,* 569 U.S. at 6; *Smith,* 820 F.3d at 360.

Viewed from the plaintiff's perspective, there is a near total absence of specific articulable facts after the first minute of the encounter showing an emergency requiring Swanson's intervention. This absence cannot outweigh the plaintiff's interest in directing his own medical needs and care while at his own residence. A reasonable officer in Swanson's shoes certainly could have encouraged the plaintiff to seek medical care for his condition; but wouldn't necessarily have continued to detain the plaintiff and threaten him with jail for refusing to seek medical attention. This is a question that a jury must answer.

In *Ellison v. Lesher*, two police officers found the door to Ellison's apartment open, and from the outside, could see Ellison sitting on his couch inside the apartment, and appearing relaxed. 796 F.3d 910, 913 (8th Cir. 2015). When the officers tried to start a conversation with him, Ellison told them he did not want or need their help. *Id.* at 913-14. One of the officers thought

Ellison was being "mouthy" with her, and stepped inside the apartment to keep him from shutting the door. *Id.* at 914. The situation devolved into a physical altercation, with Ellison repeatedly telling the officers to get out of his apartment and leave him alone.

The officers argued that they lawfully entered the apartment pursuant to their community caretaking function. *Id.* at 915. The court, however, noted that although there are exceptions to the requirement of a warrant, mouthiness was not one of them. The court held that the "officers were on fair notice that they could not enter a home simply because they perceived as mouthy, a resident who told them that he wanted no help and desired to be left alone." *Id.*

Here, the evidence suggests that when the plaintiff perceived that Swanson was ignoring his insistence that he was fine, and that he wanted to be left alone, the plaintiff became increasingly sarcastic, derisive, insulting, and profane. Swanson, as well as non-defendant Marshall, described this as the plaintiff being uncooperative and belligerent. The community caretaking exception doesn't operate to allow police officers to remain on an individual's curtilage without a warrant because an individual was belligerent or uncooperative in the absence of an emergency, or the need to protect the person or others.

The community caretaker exception (to the extent that it then existed in this Circuit) does not apply where the officer physically intrudes on the curtilage to gather evidence of a crime. *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018); *Luer v. Clinton*, 987 F.3d 1160, 1168 (8th Cir. 2021). Once the plaintiff became belligerent or uncooperative, according to the officers, Swanson threatened him with an arrest for disturbing the peace, and told Marshall that "he's gonna go for disturbing the peace." Swanson continued to

question the plaintiff about drug use, and when he finally knocked on the plaintiff's front door, and the plaintiff's girlfriend immediately answered, Swanson's first questions to her were "Tell me about your boyfriend. What drugs are you guys taking?" Swanson's request that the plaintiff undergo a urinalysis and blood toxicology screen appears directed at finding evidence in support of his speculation that the plaintiff was under the influence of something and perhaps in violation of his probation terms. Something more than a mere speculative hunch about the possibility of drug use is necessary for the defendants to justify the plaintiff's seizure on his own property.

The Court finds that when the evidence is viewed in the light most favorable to the plaintiff, although defendant Swanson's initial contact with the plaintiff was reasonable pursuant to the community caretaker exception as it existed in August 2019, the scope of Swanson's full encounter with the plaintiff was not carefully tailored to satisfy the purpose of the initial detention. Viewed in the plaintiff's favor, the evidence does not suggest that after approximately the first minute of the encounter with the plaintiff, a reasonable officer in Swanson's situation would have, at a minimum, an arguable reasonable belief that the plaintiff's condition presented an emergency requiring medical assistance or care, or that the plaintiff presented a danger to himself or others, as a matter of law.

Here, the plaintiff was on his own property, had not committed a crime, and had repeatedly told Swanson that he was fine and wanted to be left alone. The defendants have not posited any further reason or rationale that would justify a continuation of the encounter. It was the plaintiff's Fourth Amendment right to be left alone on his own property absent an arguable reasonable belief of an emergency requiring medical care, *Jardines,* 569 U.S. at 6, *Harris*, 747 F.3d at 1017, and after the first minute of the encounter, the

evidence viewed in the plaintiff's favor does not support the conclusion that such emergency existed.

Based on the above, the Court is unable to find—given the Eighth Circuit's decision in *Ellison*—that Swanson did not violate, what was at the time of the occurrence alleged, the plaintiff's clearly established Fourth Amendment right to be secure in his home against an unreasonable seizure.

## 2. EXCESSIVE FORCE CLAIM

The plaintiff alleged that Swanson used unnecessary and excessive force when he threw him to the ground and placed him in handcuffs. Filing 21 at 8. The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment. *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013). Not every push or shove violates the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 396 (1989). The test as to whether force is excessive examines whether the officer's actions were objectively reasonable in light of the facts and circumstances the officer was facing. *Id.*; *Rohrbough v. Hall,* 586 F.3d 582, 586 (8th Cir. 2009). Objective reasonableness is judged from the perspective of a reasonable officer on the scene, and not with the 20/20 vision of hindsight. *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011).

Objective reasonableness depends on the facts and circumstances of the specific case. *Rohrbough,* 586 F.3d at 586. Circumstances relevant to the inquiry include: (1) the severity of the crime at issue, (2) whether the individual poses an immediate threat to the safety of the officers or others, and (3) whether the individual is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396; *Samuelson v. City of New Ulm*, 455 F.3d 871, 876 (8th Cir. 2006). "Force is least justified against nonviolent

misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Small*, 708 F.3d at 1005.

Further, evidence that only a *de minimis* injury was sustained does not foreclose a claim of excessive force under the Fourth Amendment. *Chambers*, 641 F.3d at 906. The appropriate inquiry is whether the force used to effect a particular seizure was reasonable. *Id*. The determination of whether the force used to effect a seizure was reasonable ultimately requires a case-specific balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Id*.

Swanson offers four justifications for the reasonableness of his use of force in taking the plaintiff to the ground and handcuffing him. Swanson first argues that the plaintiff's initial presentation allowed him to reasonably apprehend that the plaintiff was a danger to himself or others. Filing 27 at 29. However, when first encountered, the plaintiff was relatively incapacitated, and Swanson's takedown and handcuffing didn't occur until after Swanson and Marshall had been calmly conversing with the plaintiff for the better part of ten minutes. The plaintiff made no threats, or gave Swanson, or Marshall, any reason to believe he may be violent while calmly conversing with them.

Second, Swanson asserts that the plaintiff was speaking "noncomprehensively" and had an abrasion on his head. Id. The evidence viewed in the plaintiff's favor does not support Swanson's assertion that the plaintiff's speech was "noncomprehensive." Further, the fact that the plaintiff had an abrasion on his head, that was of unknown origin, doesn't automatically translate to a conclusion that he posed an immediate threat to the officers or others.

30

Third, Swanson argues that it was reasonable to keep the plaintiff in his own yard until he could discover why no one answered when he knocked on the back door of the plaintiff's home. Id. But why Swanson thought it reasonable to restrain the plaintiff on his own property when there had been no report of a disturbance of any kind isn't explained. Swanson responded to a call concerning a welfare check for the plaintiff—not a call indicating the plaintiff himself presented an immediate danger to others or was engaged in criminal activity. During the nearly ten-minute period that the plaintiff calmly conversed with the officers, nothing occurred that would reasonably suggest that the plaintiff was, or had been, threatening.

Finally, Swanson argues that the plaintiff suffered no injury from the takedown, and a de minimis use of force is insufficient to support a § 1983 claim of excessive force. Filing 27 at 29. Here, however, the plaintiff alleged that Swanson's take down caused injury to his wrists, shoulders, and back, although, there is no evidence that these injuries were anything more than transitory, and no  evidence that the plaintiff required medical care as a consequence of Swanson's actions. Filing 21 at 4. Swanson confuses the issues of *de minimis* injury with *de minimis* use of force. Certainly, a *de minimis* use of force is insufficient to sustain a claim for excessive use of force. *Hunter v. Namanny*, 219 F.3d 825, 832 (8th Cir. 2000). But a *de minimis* injury (which is what the plaintiff alleged) does not necessarily translate to a presumption that the force used to cause the injury was not excessive. Evidence that only a *de minimis* injury was sustained does not foreclose a claim of excessive force under the Fourth Amendment. *Chambers*, 641 F.3d at 906.

Here, the circumstances relevant to the inquiry concerning the use of force, when considered in the light most favorable to the plaintiff, weigh in the plaintiff's favor. The officers were called to the scene to check on the plaintiff's

31

welfare. As such, Swanson's initial intrusion onto the plaintiff's property did not involve a crime. Swanson threatened to arrest the plaintiff for disturbing the peace after the plaintiff declined to spell his last name, had repeatedly asked the officers to leave him alone, and was, in Swanson's view, belligerent. It is hard to know just whose peace the plaintiff had disturbed at this juncture. As the situation devolved, the plaintiff certainly insulted the officers, but only after he was taken down and handcuffed did his insults become much louder and laced with profanity. Still, the plaintiff made no threats toward the officers, or anyone else. Neither did the plaintiff resist when taken down and handcuffed, or at anytime exhibit behavior which could reasonably be interpreted as ready to fight or engage in a physical confrontation.

There's no evidence that the plaintiff was trying to flee or avoid arrest immediately before he was taken down—and Swanson doesn't argue or even suggest that he was. The evidence suggests that when the plaintiff stepped toward the front of his house and was then immediately taken to the ground, he had intended to see if his girlfriend was home so that Swanson could confirm what the plaintiff had been telling him about his condition. "Force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Small*, 708 F.3d at 1005. The evidence viewed in the plaintiff's favor suggests that he was just such a person—a nonviolent individual who was, at best, a misdemeanant not actively resisting arrest and who had posed no, or at worse, little threat to the officers' security or the public's safety.

In *Karels v. Storz*, 906 F.3d 740 (8th Cir. 2018), the plaintiff was taken down to the ground and handcuffed when she was being arrested for disorderly conduct. The court found that considering the circumstances surrounding the seizure, the officer's use of force was not objectively reasonable as a matter of

law. *Id.* at 745. The officers were responding to a report of a person who was drunk and argumentative in the home where she was living at the time, which was not necessarily a crime. She had not attempted to physically harm the officers, the complainant who called the police did not feel threatened by the plaintiff, and the officer reported that his use of force was to effect an arrest, not to protect the officers or others. *Id.* Importantly, the court also concluded that the officers were not entitled to qualified immunity for their conduct, finding that "several cases establish that every reasonable officer would have understood that he could not forcefully take down Karels—a nonviolent, nonthreatening misdemeanant who was not actively resisting arrest or attempting to flee." *Id.* at 747. *Karels* concerned conduct occurring in 2015.

As noted above, the factors which resulted in finding that the officer's use of force was not objectively reasonable in *Karels*, and that the officers were not entitled to qualified immunity, are present here. The Court finds that whether Swanson's use of force was excessive is not excused due to qualified immunity. Further, whether Swanson's use of force was excessive or unreasonable is a question for a jury to resolve.

### 3. UNLAWFUL SEIZURE AND SEARCH OF BODY FLUIDS

The plaintiff alleged that defendants Swanson and Chinn conducted a warrantless seizure and search of his person by requiring him, under the threat of being jailed, to submit to the collection of his blood and urine for testing without probable cause, exigent circumstances, or the plaintiff's voluntary consent. Filing 21 at 9. Blood testing compelled by law enforcement plainly constitutes the search of a person within the meaning of the Fourth Amendment. *Schmerber v. California,* 384 U.S. 757, 767 (1966). Urinalysis demanded by government agents is likewise indisputably a search within the

meaning of the Fourth Amendment. *Ferguson v. City of Charleston,* 532 U.S. 67, 77 (2001). Search warrants are ordinarily required for the search of a dwelling, and absent an emergency, no less could be required where an intrusion into a human body is concerned. *Schmerber*, 384 U.S. at 770.

An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents. A warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope. *Skinner v. Railway Labor Executives' Ass'n.,* 489 U.S. 602, 621-22 (1989). Searches conducted without a warrant issued upon probable cause are presumptively unreasonable, subject to a few specifically established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967).

One such exception is the subject's consent to a search. *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004). A "warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to the search." *United States v. Brown*, 763 F.2d 984, 987 (8th Cir. 1985). The inquiry has two parts: (1) was there consent to the search; and, if so, (2) did the person subject to the search consent knowingly and voluntarily. *Cedano-Medina*, 366 F.3d at 685. Whether a consent to search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *Arciniega*, 569 F.3d at 398.

Factors relevant to the issue of whether a subject's consent was voluntary include: (1) the subject's age; (2) the subject's general intelligence and education; (3) whether the subject was intoxicated or under the influence

34

of drugs; (4) whether the subject was informed of a right to not consent or given *Miranda* rights; and, (5) did the subject have prior experience with law enforcement allowing the subject to have knowledge of the protections the legal system can provide when facing an arrest or encounter with law enforcement. *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990).

The environment in which consent was given is also important, and a court should consider: (1) the length of any detention or interrogation; (2) whether there were threats, physical intimidation, or punishment to obtain consent; (3) whether police made promises or misrepresentations; (4) was the subject in custody or under arrest when consent was obtained; (5) was the subject in a public or secluded place when consent was given; and, (6) did the subject stand by silently or object to the search. *Id.*

Mere acquiescence to an officer's claim of lawful authority is not proof of knowing and voluntary consent. The test is whether a reasonable person would have believed that the subject of the search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making. *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004).

The defendants make two, somewhat inconsistent, arguments that the plaintiff was not subject to an unreasonable search. First, the defendants argue that Nebraska statutory law authorized Swanson to take the plaintiff to a medical facility because he appeared "mentally or physically unable to care for himself," or because there was probable cause to believe he was a dangerous mentally ill person. Filing 27 at 31. As discussed above, the evidence viewed in the plaintiff's favor does not support the defendants' argument. After approximately the first minute of the encounter a reasonable officer in Swanson's situation would not have had, at a minimum, an arguable

reasonable belief that the plaintiff's condition presented an emergency requiring medical assistance or care, or that the plaintiff was mentally ill, or that he presented an immediate danger to himself or others.

Second, the defendants argue that the plaintiff was not required to go to the hospital and provide blood and urine for testing. Instead, he was given a choice to either go to the hospital for testing and receive a citation for disturbing the peace, or he could go to jail. The plaintiff, according to the defendants, chose to go to the hospital and consented in writing to the collection and testing of his blood and urine.[3] Filing 27 at 31. However, the plaintiff's mere acquiescence to the options provided by Swanson and Chinn is not proof that he knowingly and voluntarily chose to go to the hospital, and not proof that he knowingly and voluntarily consented to testing of his blood and urine. Escobar, 389 F.3d at 785.

Here, shortly after Swanson arrived on the scene, the plaintiff was telling Swanson and Marshall that he was fine, and what they had observed when they first arrived was something that had happened to him before and was due to him not drinking enough water. The video evidence viewed in the light most favorable to the plaintiff does not blatantly contradict the plaintiff's claim that he was fine and didn't need the officers' assistance. After about four minutes, where the plaintiff was cooperating with the officers while they ignored his repeated representations that he was fine, the plaintiff tells the officers that he "doesn't need to do this"—apparently hoping to end Swanson's questioning, as well as Swanson's accusations that it looks like the plaintiff

---

[3] The defendants do not explain how, on the one hand, Swanson and Marshall could have found the plaintiff to be mentally or physically unable to care for himself, or mentally ill, but on the other hand, have the mental capacity to knowingly and voluntarily consent to Swanson's demand that he go to the hospital for testing.

was "under the influence of something." Filing 14-2 at 4:46- 5:26. Swanson's response was to threaten the plaintiff with jail for not spelling his last name. Filing 14-2 at 5:26-5:32.

Ultimately, after discussing options with Chinn, Swanson told the plaintiff that he couldn't force him to go to the hospital for a urinalysis. Instead, Swanson gave the plaintiff the option of either going to the hospital for testing and receive a citation for disturbing the peace, or he could go to jail. Filing 14-2 at 21:13-27:12. The defendants argue that the options Swanson offered were alternatives that he could have required under the circumstances. Filing 27 at 31. Further, the defendants argue that the plaintiff did not have a clearly established right permitting him to avoid the collection of his blood and urine under the circumstances of this case. Filing 27 at 31-32.

The Court finds the defendants' arguments unpersuasive. The evidence viewed in the plaintiff's favor suggests that the options Chinn and Swanson gave the plaintiff, were a choice as to how he wanted his Fourth Amendment rights violated. He could consent to a warrantless search of his person, or go to jail for a highly questionable charge of disturbing the peace. Under these conditions, the plaintiff's consent could not be considered knowing and voluntary, and not the product of duress or coercion. Before Swanson gave the plaintiff his options, the plaintiff had specifically refused treatment from the rescue squad, disputed the assertion made by one of the responders that he could not refuse to go to the hospital to get checked out, and repeatedly told Swanson, Marshall, the responders, and his girlfriend that he did not want to go to the hospital. The plaintiff consented to going to the hospital only after Swanson (who had spoken with Police Chief Chinn about the situation) told him that if he didn't agree to go to the hospital and cooperate with giving blood and urine for testing, he would be jailed.

37

Here, when the evidence is considered in the plaintiff's favor, the environment in which the plaintiff's consent was obtained shows that his agreement to go to the hospital to have his blood and urine tested was the product of duress and coercion. He had been detained for several minutes, threatened with jail if he refused Swanson's demands, misrepresentations were made that he committed the offence of disturbing the peace, he was in custody, handcuffed, and restrained on the ground, and he certainly did not stand by silently or fail to object to being required to go to the hospital and have his blood and urine tested.

The defendants' reliance on *Schmerber v. California*, 384 U.S. 757 (1966) in support of the argument that the plaintiff did not have a clearly established right to avoid the collection of his blood and urine is misplaced. Schmerber had been in a traffic accident. A police officer at the scene shortly after the accident had occurred observed the smell of alcohol on Schmerber's breath, and that his eyes were "bloodshot, watery, sort of a glassy appearance." When observed at the hospital two hours later, similar symptoms of drunkenness were noted. Schmerber was told he was under arrest, given his *Miranda* rights, and was required to provide a blood sample without the police first obtaining a search warrant. *Id.* at 768-69.

The government argued that the search of Schmerber's blood was permitted as a search incident to arrest. The Court, however, noted that the mere fact that a lawful arrest would allow a search rests on two factors—the immediate danger of a concealed weapon, and the possible destruction of evidence. In rejecting the government's search incident to arrest argument, the Court wrote the following.

Whatever the validity of these considerations in general, they have little applicability with respect to searches involving intrusions

beyond the body's surface. The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

*Id.* at 769-70.

Nonetheless, the Court held that there was no violation of Schmerber's Fourth Amendment rights given that the officer in this case might reasonably have believed that he was confronted with an emergency where the delay necessary in obtaining a warrant threatened the destruction of evidence due to the fact that any alcohol in Schmerber's system would dissipate over time. *Id.* at 770-71.

Here, Swanson only speculates, albeit repeatedly, that the plaintiff may be under the influence of something. It is true that the 911 caller, when prompted by dispatch, speculated that the plaintiff may be having a drug reaction. It is also true that the plaintiff's initial presentation to law enforcement could cause a reasonable officer to suspect that he may be under the influence. However, after approximately a minute, the plaintiff's mental acuity appeared to be relatively normal, and he provided a plausible explanation for his prior presentation—he was dehydrated and what the officers saw had happened before. Other than the plaintiff's initial presentation, the defendants do not point to any other indica of intoxication that is not contradicted by the video evidence. Further, Swanson told the plaintiff that he wanted to confirm what the plaintiff told him about his condition with his girlfriend. However, when Swanson had the opportunity to

39

speak with DuMars, and she actually did confirm the plaintiff's explanation for his presentation, Swanson continued to insist that the plaintiff must go to the hospital for evaluation, or go to jail if he refused.

Not only is there an absence of any indicia of drug use in this record outside of the plaintiff's initial presentation, the defendants have also not pointed to evidence suggesting an exigency that would obviate the requirement for a warrant before subjecting the plaintiff, over his many objections, to an examination of his blood and urine for alcohol or drugs.

When the evidence and all reasonable inferences from the evidence are viewed in the light most favorable to the plaintiff, the Court finds that the plaintiff consented to going to the hospital for blood and urine testing, but that his consent was not voluntary. Further, the evidence suggests that Swanson and Chinn knew that they could not force the plaintiff to undergo a blood draw or urinalysis, but yet embarked on a plan to force his consent to do what they wanted, but what they could not legally compel. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Malley,* 475 U.S. at 341. Swanson and Chinn's plan to circumvent what they knew was unlawful is not shielded by the doctrine of qualified immunity. A jury will resolve the factual issues presented under this claim.

### 4. MUNICIPAL LIABILITY

The plaintiff alleged that Police Chief Chinn was the final policymaking authority for City of Wayne regarding law enforcement, and it was his directive that caused the violation of the plaintiff's constitutional rights. The plaintiff also alleged that Chinn and the city failed to supervise and train its employees regarding the plaintiff's constitutional rights, and failed to investigate and discipline officers for constitutional rights violations, which, the plaintiff

alleged, amounts to "deliberate indifference to the constitutional rights of persons within the City." Filing 21 at 9.

The defendants argue that the City of Wayne does not have a written policy for police officers regarding medical situations, and as such, there is no evidence Swanson was "pursuing an illegal policy of the city." The defendants also posit that, contrary to the plaintiff's argument and evidence, Wayne, Neb. Code of Ordinances § 32.034—regarding the duties of the Chief of Police—does not support the allegation that Chinn had final policymaking authority for the city. Filing 27 at 33.

The absence of a written policy regarding medical situations does not necessarily mean that the city is not potentially liable for the actions of its officers or Chief of Police. A local municipality may be liable under § 1983 for policies causing constitutional torts, and the policies may be set by the municipality's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy." *McMillian v. Monroe Cnty., Ala.,* 520 U.S. 658, 694 (1997). An unconstitutional policy can be inferred from a single decision taken by the highest governmental official responsible for setting policy in that area of the government's business. *Dean v. Cnty. of Gage, Neb.,* 807 F.3d 931, 940 (8th Cir. 2015).

A trial court is tasked with identifying those officials or governmental bodies who speak with final policymaking authority for the local government concerning the action alleged as the cause of the particular constitutional or statutory violation. *Angarita v. St. Louis Cnty.,* 981 F.2d 1537, 1546 (8th Cir. 1992). Whether Chinn exercised final policymaking authority for the city in the area of law enforcement is a question of state law. *Atkinson v. City of Mountain View, Mo.,* 709 F.3d 1201, 1214 (8th Cir. 2013).

Both parties rely on § 32.034 (filing 26-1 at 2) in support of their divergent positions. The city ordinance references Neb. Rev. Stat. § 16-323, which identifies the authority, powers, and duties of the Chief of Police and police officers for first class cities.[4] The texts of both enactments are substantively identical. Both provide that the police chief "shall have the immediate superintendence of the police." Importantly, both provide that the chief and officers shall have the power and duty to arrest all state and city law offenders "in the same manner as a county sheriff," and "shall have the same power as [a county sheriff] in relation to all criminal matters arising out of a violation of [a city ordinance]." *Id.*

Because county sheriffs have been held to represent final policymaking authority for their respective counties in the area of law enforcement investigations and arrests, *Dean*, 807 F.3d at 942, so too are police chiefs for first class cities the final policymaking authority in the area of law enforcement investigations and arrests for their respective cities under Nebraska law. The Court finds that the evidence now before it sustains a finding that Chinn is the final policymaker in the area of law enforcement investigations and arrests for the City of Wayne.

For Chinn to be held liable for the conduct of his officers, he must have participated to some extent in that conduct, and known about and facilitated the conduct, approved it, condoned it, or turned a blind eye for fear of what others might see. *Angarita*, 981 F.2d at 1545. Here, Swanson and Chinn had an extended telephone conversation after the plaintiff had been taken down and handcuffed. Swanson described for Chinn the actions he and Marshall took

---

[4] The reference in § 32.034 to § 16-323, which specifically pertains to first class cities, allows the Court to infer, for the purposes of the defendants' motion alone, that the City of Wayne meets the definition for a first class city found in Neb. Rev. Stat. § 16-101.

in restraining the plaintiff. A reasonable inference arises from Swanson's end of the conversation that he discussed with Chinn a strategy to force the plaintiff, against his will, to agree to go to the hospital and submit to a blood draw and toxicology screen.

The Court finds that there is evidence, which if believed by a jury, shows that Chinn knew about and condoned or approved of his officers exceeding the scope of the initial welfare check, as well as evidence of his officers' use of unnecessary or excessive force to take down the plaintiff and restrain him in handcuffs while he was on his own property. There is also a reasonable inference from Swanson's end of the phone call with Chinn that Chinn suggested or facilitated a strategy to overcome the plaintiff's express refusal to go to the hospital and submit to the testing of his blood and urine. Chinn's official actions, if believed by a jury, would be sufficient to impose liability on the city.

Finally, the defendants argue that the plaintiff's allegations regarding the city's failure to train its officers are merely "conclusory and vague allegations." Filing 27 at 33. The plaintiff alleged in his amended complaint that the city and Chinn have failed to train and supervise its employees and agents regarding the plaintiff's constitutional rights, and have failed to investigate and discipline officers for constitutional violations. Filing 21 at 9. The defendants' answer to the amended complaint generally denied the plaintiff's allegation. Filing 22 at 4.

The defendants' evidence responsive to the plaintiff's allegation is found in Chinn's affidavit. Chinn averred that there is no written Wayne Police Department policy regarding the handling of welfare checks, so there is no evidence Swanson was pursuing an illegal city policy, and no evidence of

43

deliberate indifference regarding Chinn's, or the city's, handling of the occurrence. Filing 27 at 33.

In *City of Canton, Ohio v Harris,* the Court rejected the argument that the defendants make here—that only unconstitutional policies are actionable under § 1983. 489 U.S. 378, 387 (1989). Instead, the Court concluded that there are limited circumstances in which a failure to train allegation can be the basis for liability under § 1983. *Id.* "[T]he inadequacy of police training may serve as the basis for liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. The focus in determining whether a city has liability concerns the adequacy of a training program in relation to the tasks the particular officers must perform, and for liability to attach, the specific training program deficiency must be closely related to the ultimate injury. *Id.*

Even if, as Chinn claims here, there is no policy, and presumably, no training, on how to handle a specific situation such as a welfare check, there must first be an obvious need for the training before a failure to have it will be considered a constitutional violation. *See Mendoza v. United States Immigration and Customs Enforcement,* 849 F.3d 408, 420 (8th Cir. 2017). To establish a failure to train claim, a plaintiff must show that (1) the municipality's training practices were inadequate, (2) the municipality was deliberately indifferent to the plaintiff's rights when adopting the training practices such that the failure to train reflected a deliberate or conscious choice, and (3) the plaintiff's injury was actually caused by the alleged deficiency in the training practices. *Graham*, 5 F.4th at 891.

Summary judgment is proper if the movant, which here is the City of Wayne and Chinn, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ.

P. 56(a). The summary judgment procedure serves to isolate and dispose of claims and defenses that are not factually supported prior to trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986); *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). The movant has the initial obligation to inform the court of the basis for its motion and must identify the portions of the record that it believes demonstrates the absence of a genuine dispute of material fact. *Torgerson*, 643 F.3d at 1042. This initial burden is not stringent and is regularly discharged with ease. *St. Jude Med., Inc. v. Lifecare Int'l, Inc.,* 250 F.3d 587, 596 (8th Cir. 2001). But still, it is a burden that the movant must shoulder.

The moving party may fulfill its burden by either producing evidence negating an essential element of the nonmoving party's case, or show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1106 (9th Cir. 2000). Stated differently, if the nonmovant must prove *X* to prevail at trial, the movant can either produce evidence that *X* is not so, or point out that the nonmovant lacks the evidence to prove *X*. *Bedford*, 880 F.3d at 996-97.

The need for police officers to be trained regarding a person's Fourth Amendment rights and how those rights may be violated during an investigatory stop or welfare check is certainly obvious. Here, however, the defendants have not submitted evidence of any kind concerning the training the city's police officers in general, and Swanson in specific, receive regarding the allegations in the plaintiff's complaint, or any evidence regarding the city's, or Chinn's, record regarding past constitutional rights violation claims and how such matters were investigated and resolved.

It is difficult to conceive that Swanson, as well as all of the city's police officers, have not received such training, but just what the training was is a

45

matter of evidence that the defendants were obligated to provide in support of their motion for judgment as a matter of law. In this regard, the defendants have not provided a showing, or produced evidence, that negates the plaintiff's allegation of inadequate training, or pointed out how the plaintiff's evidence fails to prove that the city's police officers were inadequately trained.

However, neither has the plaintiff presented evidence showing that the city police have not, in fact, received any training with respect to the plaintiff's claim, or that the training the city's police received is deficient regarding an officer's response to a welfare check and that such deficiency is closely related to the plaintiff's ultimate injury.

Given the absence of evidence from both the plaintiff and defendants with respect to the plaintiff's failure to train claim, the Court finds itself unable to conclude that the defendants are entitled to judgment as a matter of law, or that the plaintiff's evidence creates an issue of fact for a jury to resolve. Accordingly, the defendants' motion for summary judgment must be denied, but the plaintiff should not read anything positive into the Court's conclusion in this particular claim.

## III.   CONCLUSION

The defendants' motion for summary judgment must be denied regarding all claims for the reasons cited above.

IT IS ORDERED:

1.    Defendants' motion for summary judgment (filing 25) is denied.

46

2.    This matter is referred to the Magistrate Judge for case progression.

Dated this 25th day of October, 2021.

BY THE COURT:

John M. Gerrard
United States District Judge